**IN THE UNTED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WINDWARD CAPITAL, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.: |
| | § | |
| NORTHERN FRAC PROPPANTS II, LLC, | § | |
| a/k/a AQUASIZE LLC, JEFFERIES | § | |
| ALSTON, PATRICK A. TESSON, | § | |
| DANIEL KOXLIEN, BRIAN MORA, | § | |
| and J AND P CAPITAL, LLC, a/k/a PJ | § | |
| CAPITAL LLC, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF WINDWARD CAPITAL, LLC'S ORIGINAL VERIFIED COMPLAINT
AND APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY
INJUNCTION, AND PERMANENT INJUNCTION**

Plaintiff Windward Capital, LLC ("Windward" or "Plaintiff") files this Original Verified

Complaint and Application for Temporary Restraining Order, Preliminary Injunction, and

Permanent Injunction against Defendant Northern Frac Proppants II, LLC, a/k/a Aquasize LLC

("NFP" or the "Company"), and its individual Members, Defendants Jefferies Alston, Patrick A.

Tesson, Daniel Koxlien, Brian Mora, and J and P Capital LLC, a/k/a PJ Capital LLC.

## I.    INTRODUCTION

1.      This action arises from the wrongful, malicious, and fraudulent attempts by the

majority Members of NFP  to "squeeze down" and/or "out" Plaintiff's minority interest in NFP

by selling all or substantially all of the Company's assets on terms that will substantially impair

Windward's investment in the Company and prejudice Windward's ability to recover that

investment.

2.      In particular, the individual member Defendants are attempting to complete a planned sale of substantially all of the Company's assets to Badger Mining Corporation ("Badger") for a price that is significantly below fair market value of the Company's assets (the "Planned Transaction").

3.      The Defendants engaged in a rushed and inadequate review of the Planned Transaction and an approval process for the sale that is insufficient under the terms of the Operating Agreement and constitutes bad faith and a breach of the Defendants' fiduciary duties to Windward and to the Company.

4.      Moreover, following their receipt of Windward's objections to the Planned Transaction, Defendants Jefferies Alston, Patrick Tesson (the co-CEOs of NFP), and member J and P Capital LLC, agreed to buy out Windward's membership interest in NFP in exchange for Windward releasing its claims in connection with the Planned Transaction.

5.      Following the execution of this agreement, however, Defendants repeatedly missed deadlines set for the wiring of the buy-out and settlement funds, all the while promising Windward's representatives – orally and in writing – that payment would be, and had been, made according to the terms of the parties' agreement, and as further confirmed by NFP's counsel.

6.      When confronted by Windward's representatives regarding their repeated missed deadlines, Defendants Alston and Tesson attempted to again renegotiate the terms of the buy-out of Windward's membership interests to which the parties had already agreed.

7.      When Windward's representatives threatened suit in order to stop the Defendants from their thinly-veiled efforts to swindle Windward out of its investment in NFP, Defendant Alston replied on April 11, 2015, "do what you need to do."

8.     As a result of the Defendants' wrongful and fraudulent actions, including the Defendants' wanton disregard for the rights of others, Windward is compelled to file this lawsuit.

9.     Moreover, absent the entry of immediate injunctive relief, Windward stands to be immediately and irreparably harmed because the Planned Transaction will likely leave NFP without any assets and leave Windward with no source of recovery.

## II.     PARTIES

10.     Plaintiff, Windward Capital, LLC, is a limited liability company organized under the laws of the State of Wyoming, and maintains its principal place of business at 44 Nassau Street, Suite 370, Princeton, New Jersey, 08542.   Windward is a founding member of NFP.

11.     Defendant NFP is a limited liability company organized under the laws of the State of Delaware and maintains its principal place of business at 440 Benmar, Suite 3051, Houston, Texas 77060.

12.     Defendant Jefferies Alston ("Alston"), who currently serves as co-CEO of NFP, is an individual member of NFP as well as a member of J and P Capital LLC, and who, upon information and belief, resides at 19065 Highway 1061, Amite, Louisiana 70422.

13.     Defendant, Brian Mora ("Mora"), who is an individual who currently serves as CFO of NFP, is an individual member of NFP who, on the day of the Members' meeting was also listed as an employee of NFP's auditor, Pedelahore LLP, and upon information and belief, resides at 19 Oaklawn Drive, Metairie, Jefferson County, Louisiana 70005.

14.     Defendant J and P Capital LLC, a/k/a PJ Capital LLC ("J and P"), is a limited liability company organized under the laws of the State of Louisiana and a member of NFP.  J and P maintains its principal place of business at 1010 Common Street, Suite 2100, New Orleans, Louisiana 70112.

15.     Defendant Patrick A. Tesson ("Tesson") is an individual who currently serves as Co-CEO of NFP and who, upon information and belief, resides at 321 Sena Dr, Metairie, Louisiana 70005-3343.  According to the other Defendants, Defendant Tesson is a member of NFP, although the current Operating Agreement does not identify Tesson as a member. Moreover, Windward has never been provided with, nor consented to, any revision to the Operating Agreement that resulted in Tesson's personal membership interest in the Company.

16.     Defendant Daniel Koxlien ("Koxlien") is an individual who currently serves as COO of NFP and who, upon information and belief, resides at Rr 2, Whitehall, Wisconsin, 54773.

## III.     JURISDICTION AND VENUE

17.     This Court has original subject matter jurisdiction over this action, and the claims asserted herein, pursuant to 28 U.S.C. § 1332(a)(1) (diversity) because this is a civil action between citizens of different States, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.     This Court has general personal jurisdiction over the Defendant NFP because NFP conducts substantially all of its business within this judicial district.

19.     This Court has personal jurisdiction over the Defendant Members by virtue of the Second Amended and Restated Limited Liability Company Agreement of NFP, dated April 8, 2014 (the "Operating Agreement," attached hereto as Ex. A), which provides in Section 12.7 that each of the individual member Defendants "consents to the jurisdiction and venue of any federal or state court located within Harris County, Texas . . . ."

20.     This Court has personal jurisdiction over Defendant Tesson by virtue of Tesson's role as Co-CEO of NFP and his participation in the wrongful and malicious acts set forth herein.

21.     Venue is properly laid in this Court pursuant to 28 U.S.C. §§ 1391 and 1400(a) because a substantial part of the acts giving rise to the claims asserted herein occurred in this judicial district and because the individual Defendant Members consented to venue in this judicial district in Section 12.7 of the Operating Agreement.

## IV.    FACTUAL BACKGROUND

22.     Windward's involvement with NFP began on January 1, 2013, when Windward signed an engagement letter with NFP's predecessor to provide financial advisory services in connection with certain private placement transactions and M&A initiatives as a contracted non-exclusive placement agent.

23.     On or about August 22, 2013, Windward became a founding member of NFP when it executed the Operating Agreement.

24.     Since becoming a founding member of NFP, Windward continued to perform its financial advisory role and, until September 2014, received monthly retainer fees from NFP.

25.     Windward's responsibilities as a financial advisor are set forth in an engagement letter dated August 23, 2013.

26.     As a financial advisor, Windward has assisted the Company with private placements of debt and equity securities, including the $77.3 million credit facility with Deutsche Bank AG dated December 23, 2013, the $7.5 million private placement of equity dated April 4, 2014, joint venture transactions, acquisitions, strategic merger and acquisition discussions with third-parties, and certain commercial development activities.  Windward elected to forego its cash placement fee in connection with the foregoing equity private placement in the best interests of NFP.

27.    On Monday, June 2, 2014, Windward received a termination letter from NFP's counsel alleging that its engagement by NFP had terminated in November, 2013.   When Windward disputed such termination, NFP's counsel issued a letter to Windward acknowledging that no termination occurred on such date.

28.    Windward continued to pursue additional corporate finance, strategic merger and acquisition and commercial opportunities on behalf of the Company during 2015, with the approval of NFP as confirmed by Defendant Alston.

**The Planned Sale of NFP's Assets to Badger Mining Corporation**

29.    On Monday, March 30, 2015, Windward received copies of a purported Notice of Meeting of Members dated March 30, 2015, and an accompanying purported Proxy Statement concerning the proposed sale of substantially all of NFP's assets to Badger (the "Notice and Proxy Statement," attached hereto as Exhibit B), which was to be considered at a purported meeting of the Members of on Monday, April 6, 2015 (the "Meeting").

30.    The Proxy Statement and Notice were defective for reasons including but not limited to the following:

a.    Windward and other Members of NFP, and any listing of their respective membership interests, are omitted from these statements;

b.    The statements do not describe the Planned Transaction adequately, including no information confirming the interests of the Member Managers and Member Officers in the Planned Transaction;

c.    Defendants have offered no explanation as to why an independent valuation of NFP's assets has not been performed;

    d.      The amount required to pay off NFP's credit facility with Deutsche Bank is not disclosed;

    e.      No explanation of the accounting and tax structure of the Planned Transaction is included;

    f.      No explanation is included for the Defendants' failure to obtain a fairness opinion from a third-party investment bank;

    g.      Little information, if any, regarding Badger is included.

    h.      The truncated time period between the Notice and the Meeting of Members did not afford the Members sufficient time in which to make an informed decision regarding the Planned Transaction.

31.    Because the Planned Transaction would result in the sale of assets in an amount exceeding $250,000, the transaction required the approval of a Special Majority of the Company's Board of Managers, as set forth in Section 6.8(b)(iv) of the Operating Agreement.

32.    A meeting of the Members of  (the "Meeting") occurred on April 6, 2015, in New Orleans, Louisiana, on less than five business days' notice to all Members.

33.    Prior to and during the Meeting, Defendant Alston and others ignored and/or rebuffed repeated requests by Windward and its representative at the member meeting for additional information regarding the Planned Transaction.

34.    At Meeting, Windward's representative, Mr. Raymond Rohne, expressed Windward's objections to the Planned Transaction including, but not limited to the wholly insufficient information received from NFP regarding the transaction, which severely limited the ability of Windward and all other Members from making an informed decision regarding the Planned Transaction.

35.     When a vote of NFP's Members was called, Windward voted against approving the Planned Transaction.

36.     Although other minority Members voted in favor the Planned Transaction, those Members are employees of NFP and, upon information and belief, only voted to approve the Transaction as a result of undue and unlawful influence by Defendants Alston and Tesson and their representatives.

37.     If completed, the Planned Transaction will result in the sale of substantially all of NFP's assets, and will substantially prejudice the ability of minority Members to recoup their investments.

**Defendants Reveal Additional Wrongful Acts**

38.     In addition, the Members' Meeting revealed additional procedural and substantive deficiencies with the Planned Transaction, as well as other wrongful acts committed by the Defendants.

39.     For example, at the Meeting, Defendants Alston, Tesson, Mora and Koxlien were either unwilling or unable to inform the other Members of the net purchase consideration that would be available to distribute to NFP's Members following the Planned Transaction, and were either unwilling or unable to identify the final terms and conditions of the Planned Transaction.

40.     Defendants Alston and Tesson were also unable or unwilling to state whether NFP's senior secured lender, Deutsche Bank AG, would agree to allow NFP to terminate a $77.3 million credit facility, for which Windward had advised NFP and assisted in securing in December, 2013, on reasonable terms.

41.     Moreover, the Defendants also revealed at the Members' Meeting that they had entered into an acquisition option agreement with Badger Mining Corporation on September 11,

2014, which specified a purchase price of $150 million in cash for NFP's assets, and which provided for an exclusivity and no-shop provision without first seeking any alternative potential bid for NFP. Windward never received notice of such acquisition option agreement with Badger, despite the fact that NFP was required to provide such notice to all Members including Windward.

42.    However, Windward received a written proposal by NFP through its counsel – also on September 11, 2014 – to buy out all of Windward's holdings in NFP for <u>less than fifty percent</u> of its pro rata share of the proposed Badger acquisition purchase consideration of $150 million.

43.    It was also revealed at the Members' Meeting that Defendant Alston was intending to withdraw from NFP's operating cash account prior to the closing of the Proposed Transaction at least $2,500,000, as payment for a financial advisory fee to be charged to NFP by J and P related to the proposed Badger transaction, in order to repay certain previously undisclosed personal loans he had entered into during 2014.

44.    In addition, Defendants Alston and Tesson disclosed plans to immediately disburse to J and P from NFP a cash disbursement amount equal to 125% of its original purchase consideration at closing of the Planned Transaction, however all other Members would not be receiving any proceeds out of the Planned Transaction.

45.    Defendant Alston separately revealed that he had negotiated and that NFP had entered into a short-term frac sand purchase agreement with Hi-Crush Proppants, LLC, a competitor operated by Alston's son, Jay Alston. Windward understands from other sources that the sale prices were approximately 30% below the publicly reported average sale price for such competitor.

46.     The Defendants also disclosed at the Members' meeting that bonuses would be paid to all employees in an aggregate amount that was unknown to Defendants Alston and Mora, the Company's CFO.

**The Defendants Transfer and Issue Units in  in Violation of the Operating Agreement**

47.     It was revealed at the Meeting that Defendants Alston and Tesson have sold a portion of their NFP preferred units held by Defendant J and P (a/k/a PJ Capital LLC) to Defendant Koxlien prior to the Member Meeting without notifying Members including Windward, in violation of Section 9.1 of the Operating Agreement.

48.     This disposition also violated a certain Subscription Agreement by and between and J and P Capital LLC, dated April 4, 2014, which provides that J and P Capital LLC "…is acquiring the [Units] for its own account for investment and not with a view to distribution…."

49.     Most troubling, the Defendants revealed that shortly after NFP entered into an earlier proposed transaction with Badger Mining Corporation, whereby Badger would acquire all of the assets of NFP for approximately $150 million, Defendants Alston and Tesson invested $2.5 million in NFP through J and P for preferred units at a pre-money valuation of $32.5 million.

50.     Stated another way, Defendants Alston and Tesson admitted that they caused the Company to issue them preferred units at a 78% discount based on the acquisition price to be paid by Badger Mining Corporation.  Windward received no prior notice of this issuance, nor did it receive any opportunity to exercise its preemptive rights with respect to these units as guaranteed in the Operating Agreement.

51.     Defendants Alston and Tesson also indicated that they granted themselves additional favorable terms in connection with their acquisition of such preferred units, including

a guaranteed 125% priority return to Defendants Alston and Tesson upon any liquidation event, such as the Planned Transaction.

52.     Despite the preferential treatment and disproportionate payout they wrongfully arranged for themselves, Defendants Alston and Tesson confirmed at the Members' Meeting that no other member would be receiving any distribution as part of the Planned Transaction, and that Defendants Alston and Tesson intended to utilize the net cash proceeds by investing in unspecified investment opportunities in the future.

**Defendants' Refuse to Permit the Members to Appoint Managers to the  Board.**

53.     Although the Operating Agreement specifies that five individuals shall comprise the Company's Board of Managers, the current Board number consists of only three Members, namely Defendants Alston, Koxlien and Tesson.

54.     Windward, as a founding member, along with the other founding Members, have a right to name three Members to the Board, and J and P, as investor, has the right to name one member to the Board, namely Defendant Tesson.  In addition, the founding Members and the investor have the right to jointly name one member to the Board.

55.     Despite numerous requests by Windward, however, the Defendants have refused to allow any election by NFP's Members for the remaining two board seats, in plain violation of the Operating Agreement.

## V.     APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION

56.     Windward repeats and realleges the allegations set forth in the previous paragraphs of this Complaint as if set forth at length herein.

57.     Windward seeks a temporary restraining order, preliminary injunction and permanent injunction to avoid immediate and irreparable loss, injury, and damage, pursuant to

Rule 65 of the Federal Rules of Civil Procedure. Contemporaneous with filing of this Complaint, Windward files its Motion for Temporary Restraining Order, which Windward incorporates by reference. Windward's request for a temporary restraining order, preliminary injunction, and permanent injunction is supported by the exhibits to this Verified Complaint.

58.     To establish a claim for injunctive relief, Windward must show:  (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

59.     Windward seeks a temporary restraining order, preliminary injunction and permanent injunction to prohibit the individual member Defendants from proceeding with the sale of substantially all of NFP's assets to Badger Mining Corporation and subsequent liquidation of those assets. As stated above and in Windward's accompanying Motion and supporting exhibits, unless NFP and the individual member Defendants are so enjoined, Windward will be irreparably harmed by an injury that would outweigh any harm resulting from the injunction Windward requests.  Windward's pleadings demonstrate a substantial likelihood of success on the merits, and an injunction prohibiting NFP and the individual member Defendants from selling NFP's assets to Badger without proper notice to its Members and for insufficient consideration, would not disserve the public interest.

## VI.   CAUSES OF ACTION

### COUNT I

**(Against all Defendants - Breach of Fiduciary Duty – Planned Transaction)**

60.     Windward repeats and realleges the allegations set forth in the previous paragraphs of this Complaint as if set forth at length herein.

61.     As Officers, Managers and/or majority Members of NFP, the individual member Defendants owe a fiduciary duty, including a duty of good faith, to minority Members of NFP, including Windward.

62.     For the reasons set forth herein, the consideration to be paid by Badger reflects less than half of the market value of NFP's assets and, as a result, the Planned Transaction is patently unfair to both the Company and its Members.

63.     Defendants are attempting to close the Planned Transaction imminently in order to cutoff Windward's ability to protect its rights as a member of NFP.

64.     The foregoing wrongful and malicious actions were committed in bad faith and constitute a breach of Defendants' fiduciary duties to other Members and to the Company.

### COUNT II

**(Against all Defendants – Breach of Fiduciary Duty - Tainted Approval of
the Planned Transaction)**

65.     Windward repeats and realleges the allegations set forth in the previous paragraphs of this Complaint as if set forth at length herein.

66.     For the reasons set forth herein, the Proxy Statement and the Notice provided insufficient information for the Members to evaluate the Planned Transaction.

67.     Moreover, Defendant Alston purposefully refused to provide Windward and other Members with material details of the Planned Transaction in order to preclude Windward and other Members from any opportunity to understand and evaluate the transaction.

68.     The foregoing wrongful and malicious actions were committed by Defendants in bad faith and constitute additional breaches of the Defendants' fiduciary duties to minority Members and to the Company.

## COUNT III

**(Against Defendants Alston, Tesson, and J and P – Fraud)**

69.     Windward repeats and realleges the allegations set forth in the previous paragraphs of this Complaint as if set forth at length herein.

70.     On Wednesday, April 8, 2015, following arms'-length negotiations between Windward, on one hand, and Defendants Alston, Tesson, and J and P (the "J and P Defendants") on the other, the parties agreed to terms that would result in the buy-out of Windward's membership interest in NFP in exchange for Windward releasing claims against the J and P Defendants, among others, and forbearing from filing this suit.

71.     This agreement called for the J and P Defendants to buy out Windward's membership interest for $1.2 million.

72.     Despite coming to an agreement with Windward, the J and P Defendants reneged on the agreement on Thursday, April 11, 2015, and attempted to substantially revise its terms and lower the buy-out price.

73.     Following additional good-faith negotiations by Windward, the parties agreed to revised terms that required Defendants Alston, Tesson, and J and P to complete a wire transfer of $1.1 million to Windward within 24 hours of executing such agreement.

74.     Remarkably, Defendants refused to wire the funds by such deadline and again attempted to revise the terms of the parties' agreement.

75.     Finally, on Friday, April 10, 2015, the parties exchanged signed signature pages "to be held in escrow" pending Windward's receipt of the aforementioned wire transfer.

76.     Defendants agreed to complete the wire transfer by 5pm Eastern Time on Friday April 10, 2015.

77.     After the 5pm deadline came and passed without Windward receiving any wired funds, Windward's counsel contacted the Defendants' counsel to inquire as to the status.

78.     Defendants' counsel responded via email, stating that "the deal is still not closed but that is not what is holding this up" but rather "human error" at the Defendants' bank resulted in a failure to wire the funds and that, due to the time of day, no funds could be wired until the resumption of business "first thing" on Monday, April 13, 2015.

79.     When Windward's representatives confronted Defendant Alston regarding the J and P Defendants' wanton disregard of their own promises, and demanded that the Defendants release their signature pages and agree to another new deadline for the wire transfer, Defendant Alston attempted <u>yet again</u> to revise the terms of the parties' agreement; namely, Alston intimated that Windward may "have to take a discount" on the buy-out price to which the parties had already agreed.

80.     Defendant Alston then cut off communication with Windward, advising Windward's representatives to "do what you need to do."

81.     By repeatedly agreeing to terms with Windward, only to later renege on those same terms in order to seek a better deal, the J and P Defendants' conduct evinces an intent that

Windward rely on the J and P Defendants' representations that they intended to wire the buy-out funds to Windward.

82.     As has become clear, however, the Defendants never intended to wire the buy-out funds to Windward.

83.     Defendants' conduct demonstrates their intention to deceive and defraud Windward by making false promises in order to prevent Windward from filing a lawsuit that sought to enjoin the Planned Transaction.

84.     Windward reasonably relied on the J and P Defendants' repeated promises, including their promises to wire the buy-out funds, when it elected against filing suit against the Defendants on April 8, 9, or 10, 2015.

85.     Windward has been damaged – and stands to suffer additional irreparable damage – as a result of the fraud committed by the J and P Defendants.

## COUNT IV

### (Breach of Operating Agreement – against all Defendants)

86.     Windward repeats and realleges the allegations set forth in the previous paragraphs of this Complaint as if set forth at length herein.

87.     The  Operating Agreement places certain restrictions on each Members' ability to transfer all or some of their membership interests to others.  *See* Exhibit A, Section 9.1.

88.     Members are prohibited from transferring all or some of their membership interests to non-affiliates unless the member first obtains the prior unanimous written consent of the Members, or the transferee acquires the membership interests through a transaction in which it acquires all or substantially all of that member's assets. *See id.*

89.     In the event of any proposed transfer of a member's membership interest, the Operating Agreement grants rights of first refusal, tag-along rights, drag-along rights to the other Members, as the case may be. *Id.*

90.     In addition, the Operating Agreement provides that whenever the Company proposes to issue any new equity or other securities, every member is given certain preemptive "right[s] to purchase . . . such Member's Allocable Share of the same class of equity securities. *Id.*

91.     Pursuant to Section 9.1 of the Operating Agreement, "the Members agree that a breach of the provisions of the restrictions on Dispositions . . . may cause irreparable injury" and that, as such, "the restrictions on Dispositions may be enforced by specific performance."

92.     As set forth above, Defendants Alston, Tesson, J and P, and Koxlien took certain actions with respect to the transfer and issuance of units in NFP in violation of the Operating Agreement, namely:

a.     Alston and Tesson's transfer of units to Koxlien without notifying Windward or providing Windward with an opportunity to exercise its purchase rights under Section 9.1 of the Operating Agreement.

b.      The issuance of preferred units to Alston and Tesson at a 78% discount to the $150 million Badger acquisition proposal, also without obtaining proper approval of the Members and without notifying Windward, or providing Windward with an opportunity to exercise its preemptive rights under Section 9.1 of the Operating Agreement.

93.     These transactions, and the surreptitious manner in which they were carried out, plainly violate Section 9.1 of the Operating Agreement and, under the terms of that provision,

have caused – and continue to cause – irreparable injury on all other Members of NFP, including Windward.

## COUNT V

### (Breach of the Operating Agreement – All Defendants)

94.     Windward repeats and realleges the allegations set forth in the previous paragraphs of this Complaint as if set forth at length herein.

95.     Pursuant to Section 6.2 of the Operating Agreement, the founding Members – including Windward – are entitled to elect three Members to the Board of Managers, plus one additional Manager to be named jointly with investor J and P.

96.     In violation of the Operating Agreement, the Defendants have refused to permit the founding Members to elect individuals to fill two of the three Board positions reserved for the founding Members.

97.     Windward has suffered damage as a result of Defendants' violation of the Operating Agreement.

## COUNT VI

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

98.     Windward repeats and realleges the allegations set forth in the previous paragraphs of this Complaint as if set forth at length herein.

99.     As Members and/or Managers of NFP, and pursuant to the Operating Agreement, Defendants owe Windward a duty of good faith and fair dealing.

100.     The aforementioned wrongful, malicious, and fraudulent actions undertaken by Defendants constitute a breach of that duty and have cause harm to Windward.

## VII.    REQUESTS FOR RELIEF

**WHEREFORE**, Plaintiff Windward Capital, LLC, respectfully requests that the Court:

A.    Enter a temporary restraining order, followed by a preliminary and permanent injunction, immediately restraining and enjoining Defendants from, whether directly or indirectly, executing the Transaction or any sale of NFP's assets, or taking any action in furtherance of such execution or sale of assets, until further order of this Court;

B.    Enter a temporary restraining order and preliminary injunction restraining the Defendants from making any distributions from NFP until such time as the Court rules on Windward's claim for rescission of the challenged dispositions and issuances of membership units in NFP.

C.    Entering a permanent and mandatory injunction rescinding the dispositions and issues of NFP  membership units taken in violation of the Operating Agreement.

D.    Immediately appoint of a liquidator over NFP in accordance with Section 10.2 of the Operating Agreement in order to supervise any attempted transactions involving the Company;

E.    Enter judgment on all counts in favor of Plaintiff, including, all costs, interest, and attorneys' fees; and

F.    Grant any such relief that the Court deems just and equitable.

A courtesy copy of this document is being provided contemporaneously herewith to the following, who Plaintiff understands to be counsel for the Defendants:

    Cherish Van Mullem
    Phelps Dunbar LLP
    445 North Boulevard, #701
    Baton Rouge, Louisiana 70802
    cherish.vanmullem@phelps.com

Dated: April 13, 2015

Respectfully submitted,

DLA PIPER LLP (US)

By: */s/ Ileana M. Blanco*
    Ileana M. Blanco
    Attorney In Charge
    Federal ID: 948
    Texas Bar No. 02449590
    Wells Fargo Plaza
    1000 Louisiana Street, Suite 2800
    Houston, Texas 77002
    Telephone: (713) 425-8400
    Facsimile: (713) 425-8401
    ileana.blanco@dlapiper.com

ATTORNEYS FOR PLAINTIFF WINDWARD CAPITAL, LLC

OF COUNSEL:

Andrew Bunn
New Jersey Bar (NJ-016741990)
New York Bar (NY-2395556)
Robert Ferguson
New Jersey Bar (NJ-020632009)
New York Bar (NY-5144985)
51 John F. Kennedy Parkway
Short Hills, New Jersey 07078
Tel: (973) 520-2550
Fax: (973) 520-2551
andrew.bunn@dlapiper.com
robert.ferguson@dlapiper.com
*(Motions for Pro Hac Vice Admission Forthcoming)*

## <u>Certificate of Service</u>

The undersigned certifies that a true and correct copy of the foregoing document has been

served on the following parties by certified mail, return receipt requested, on April 13, 2015:


Northern Frac Proppants II, LLC
c/o Jefferies Alston, Chief Executive Officer
440 Benmar, Suite 3051
Houston, Texas 77060

Jefferies Alston
19065 Highway 1061
Amite, Louisiana 70422

Brian Mora
19 Oaklawn Drive
Metairie, Louisiana 70005

J and P Capital LLC, a/k/a PJ Capital LLC
1010 Common Street, Suite 2100
New Orleans, Louisiana 70112

Defendant Patrick A. Tesson
321 Sena Dr.
Metairie, Louisiana 70005-3343

Daniel Koxlien
Rr 2
Whitehall, Wisconsin, 54773


*/s/ Ileana M. Blanco*
 Ileana M. Blanco